```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2             THE WESTERN DISTRICT OF WASHINGTON

 3                        AT SEATTLE

 4   UNITED STATES OF AMERICA,          )
                                        )  Case No. CR97-51C
 5                   Plaintiff,         )
                                        )  Seattle, Washington
 6           v.                         )
                                        )  March 2, 2007
 7   CHARLES MILLER,                    )
                                        )
 8                                      )
                     Defendants.        )
 9   _____)

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOHN C. COUGHENOUR
11               UNITED STATES DISTRICT JUDGE

12


13
     For the Government:           CARL BLACKSTONE, AUSA
14

15   For the Defendant:           CHARLES MILLER, Pro Se
                                   RALPH HURVITZ, Standby
16                                              Counsel

17

18

19

20   SUSAN A. ZIELIE
21   Official Court Reporter
     700 Stewart Street
22   Seattle, Washington 98101

23   Proceedings Recorded by Computer-aided Stenography.

24

25
```

T E S T I M O N Y   I N D E X

Testimony of:
     RON CRAWFORD
          Direct by Mr. Blackstone          6
          Cross by Mr. Miller              31

E X H I B I T   I N D E X

| 1 | 8 |
| 2 | 8 |
| 3 | 11 |
| 10 | 13 |
| 11 | 14 |
| 15 | 17 |
| 17 | 20 |
| 18 | 22 |
| 20 | 23 |

```
 1              SEATTLE, WASHINGTON; FRIDAY, MARCH 2, 2007

 2                            9:45 A.M.

 3          THE CLERK:  Case No. CR97-51C, United States vs.

 4   Charles Miller.  Counsel, please make your appearances.

 5          MR. BLACKSTONE:  Carl Blackstone.

 6          MR. HURVITZ:  Good morning, Your Honor, Ralph Hurvitz

 7   for Mr. Miller.

 8          THE COURT:  Mr. Miller.

 9          THE DEFENDANT:  Morning.

10          THE COURT:  Mr. Miller, you've been charged with

11   violation of your conditions of supervision as follows.  First,

12   driving without a valid driver's license on or about April 2,

13   2006 within the District of Nevada in violation of Nevada

14   statutes.  Secondly, failing to register as a convicted felon

15   upon release of custody within the District of Nevada in

16   violation of Nevada statutes.  Third, associating with a

17   convicted felon between March and December of 2006 within the

18   District of Nevada in violation of Standard Condition No. 9.

19   Fourth, submitting false monthly reports between March 2006 and

20   October 2006 within the District of Nevada in violation of

21   Standard Condition No. 2.  Fifth, failing to provide the

22   probation office with access to requested financial information

23   between February 2006 and December 2006 within the District of

24   Nevada in violation of Special Condition 4.  And, sixth, failing

25   to respond truthfully to and following instructions of your
```

1    probation officer between February 2006 and December 2006 within

2    the District of Nevada in violation of Standard Condition No. 3.

3              I assume you plead not guilty to these charges?

4              THE DEFENDANT:  I can't really answer those.  I have an

5    announcement to make.

6              THE COURT:  Do you plead guilty or not guilty?

7              THE DEFENDANT:  I can't plead to those because I believe

8    they are a fraud.

9              THE COURT:  I'm not interested in your announcement.

10             Go ahead.

11             MR. BLACKSTONE:  Your Honor, we'd call Probation Officer

12   Ron Crawford.

13             THE DEFENDANT:  Am I being denied for making my own

14   record?

15             THE COURT:  We're going to hear the evidence.

16             THE DEFENDANT:  Am I being denied of making my record?

17             THE COURT:  Nope.

18             THE DEFENDANT:  Can I make my record before a witness is

19   called?

20             THE COURT:  No.

21             THE DEFENDANT:  Can I make my record at all today so

22   we'll have a complete record?

23             THE COURT:  Swear in the witness.

24             THE DEFENDANT:  Will I be allowed to submit evidence?

25             RON CRAWFORD, being duly sworn, testified as follows:

```
 1              MR. BLACKSTONE:  May I proceed, Your Honor?

 2              THE COURT:  Yes.

 3                        DIRECT EXAMINATION

 4    BY MR. BLACKSTONE:

 5    Q   Ask you to tell us your full name, please.

 6    A   My name is Ron Crawford, C-R-A-W-F-O-R-D.

 7    Q   And you are currently working as a probation officer in Reno,

 8    Nevada?

 9    A   Yes, I do.

10    Q   Have you been responsible for supervising the defendant,

11    Charles Miller, since he's been released from custody?

12    A   Yes.

13    Q   When did that supervision begin?

14    A   Supervision of Mr. Miller began February 22nd, 2006.

15    Q   Before his supervision began, did you meet with Mr. Miller to

16    review the conditions of supervision with him?

17    A   Yes, I did.

18    Q   When did that take place?

19    A   January 19, 2006.

20    Q   If you could look for me at Exhibit 1.  There's a book of

21    exhibits in front of you.

22              MR. BLACKSTONE:  And I've given a copy to the Court as

23    well as Mr. Miller, Your Honor.

24    BY MR. BLACKSTONE:

25    Q   What is Exhibit 1?
```

1    A    The judgment in this case.

2    Q    And, when you met with Mr. Miller, did you review all the

3    conditions that are in this judgment with him?

4    A    Yes.

5    Q    Did he indicate he had any questions or concerns about any of

6    those conditions?

7    A    No questions.  However, he was concerned about the validity

8    of the judgment.

9    Q    But the actual conditions themselves, did he express any

10   confusion as to what they meant he was supposed to do?

11   A    No, none.

12   Q    And if you could look at page 4 of Exhibit 1 and identify

13   what's stapled on the bottom of page 4 there.

14   A    The statement at the bottom of page 4 states:  Upon finding a

15   violation of probation or supervised release, I understand that

16   the Court may, one, revoke supervision; two, extend the term of

17   supervision; and/or, three, modify the conditions of probation.

18   These conditions have been read to me, I fully understand the

19   conditions and have been provided a copy of them.

20   Q    And did Mr. Miller sign that document in your presence and

21   date it on the 19th of January?

22   A    Yes, he did.

23   Q    And you signed it as well?

24   A    Yes.

25           MR. BLACKSTONE:  Your Honor, we would offer Exhibit 1.

1          THE COURT:  It will be admitted.

2          (Exhibit Admitted.)

3   BY MR. BLACKSTONE:

4   Q   Now, after you began supervising Mr. Miller, did you become

5   aware that he'd received a traffic citation?

6   A   Yes.

7   Q   When and how did you first become aware of that?

8   A   I became aware of that on April 5th, 2006, when a Nevada

9   highway patrol trooper came to my office and reported the

10  incident do me.

11  Q   And did you eventually get a copy of the citation?

12  A   Yes, I did.

13  Q   If you could look for me at Exhibit 2, please.  Is that a

14  copy of the traffic citation?

15  A   Yes, it is.

16          MR. BLACKSTONE:  Your Honor, we'd offer Exhibit 2.

17          THE COURT:  It will be admitted.

18          (Exhibit Admitted.)

19  BY MR. BLACKSTONE:

20  Q   What day was Mr. Miller cited?

21  A   April 2, 2006.

22  Q   And what was the citation for?

23  A   He was cited for following too close, no valid driver's

24  license and driving while having a suspended license.

25  Q   And was he under some sort of requirement to notify you of

1   any contact with law enforcement?

2   A    Yes.

3   Q    And what was that requirement under the terms of the

4   supervised release?

5   A    Under the standard conditions, Mr. Miller's to notify the

6   probation office of any contact with law enforcement, I believe

7   it's within 72 hours.

8   Q    Did Mr. Miller notify you of his contact within 72 hours?

9   A    No, he did not.

10  Q    Did you talk to Mr. Miller about this citation at some point?

11  A    Yes, I did.

12  Q    And when was that?

13  A    That was April 14, 2006.

14  Q    So twelve days after this?

15  A    Yes.

16  Q    Tell us about that conversation.

17  A    I called Mr. Miller and scheduled an appointment for him to

18  come in to my office.  I asked him if he had any contact with law

19  enforcement.  He initially denied having any contact until we

20  discussed it further.  And I asked him about the traffic

21  citation.  And he then admitted to being cited for following too

22  close.

23  Q    Did he admit to anything else he was cited for?

24  A    After further discussion, he then admitted to also being

25  cited for having no valid driver's license.

1  Q    And did he explain why he didn't have a driver's license?

2  A    Yes, he said he left it at his office.

3  Q    Did you ask you him to provide you with a copy of it?

4  A    Yes, I did.

5  Q    Did he ever provide you with a copy of it?

6  A    No.

7  Q    Did you have any further discussions with him about whether

8  or not he had a driver's license?

9  A    Yes, I did.

10  Q    When was that?

11  A    I talked to him at his office in person on I believe it was

12  May 2, 2006.  He advised that he had what he called an

13  international driver's license, which is also called an

14  international driving permit.  But then he felt that he didn't

15  need it so he went ahead and threw it away.

16  Q    Has Mr. Miller ever obtained a valid driver's license, as far

17  as you're aware of?

18  A    Not in the state of Nevada, no.

19  Q    The citation said he was supposed to appear in Nevada court

20  April 26, 2006.  Did Mr. Miller appear to take care of that

21  citation?

22  A    No.  Not to my knowledge, no, he did not.

23  Q    Has he ever appeared in state court to take care of the

24  violation, based on your investigation?

25  A    No.

1  Q    Has he sent any threatening communication to the state court

2  of Nevada?

3  A    Yes.

4  Q    Would you look at Exhibit 3 for me.  What is that exhibit?

5  A    This is a letter entitled at the top Memorandum of Record

6  sent to the Reno Justice Court by Mr. Miller.

7  Q    And how did you get a copy of this?

8  A    I first obtained a copy from the Reno Justice Court.  Later

9  on, Mr. Miller provided me with a copy as well.

10 Q    And, essentially, what does this document say, Officer

11 Crawford?

12 A    It says that the order, on the top, it says Notice, Do Not

13 Trespass, Waiver of Tort.  Receive -- essentially, it appears to

14 threaten the Court entity and the Nevada Highway Patrol stating

15 that he would charge them $75,000 in silver coins if they pursued

16 the citation, and if there was any physical injury or damage to

17 them he would then charge $1 million in silver coins.

18 Q    Are you familiar with Mr. Miller's signature?

19 A    Yes, I am.

20 Q    Does that appear on the second page of Exhibit 3?

21 A    Yes.

22         MR. BLACKSTONE:  Your Honor, we'd offer Exhibit 3.

23         THE COURT:  It will be admitted.

24         (Exhibit Admitted.)

25 BY MR. BLACKSTONE:

1    Q    How did the Reno Justice Court react to this threatening

2    communication?

3    A    They actually were not quite sure what to do.  They

4    rescheduled the hearing.  There was no appearance at that

5    hearing.  So, essentially, it was just shelved.

6    Q    And you know what the status of this citation is today?

7    A    Yep.  I followed up earlier this week.  And they have decided

8    just to forfeit the bail amount that was posted previously.

9    Q    Let me focus on violation 2 which alleged Mr. Miller failed

10   to register as a convicted felon.  Officer Crawford, can you tell

11   us what the requirements are under Nevada law for registering as

12   a felon?

13   A    Yes.  Nevada Revised Statute 179C requires anyone convicted

14   of two or more felonies to register, in addition to people

15   convicted of qualifying felonies that include violence and sex.

16   Q    Did you determine whether or not Mr. Miller had to register

17   under that law?

18   A    Yes.

19   Q    Did you provide him with notice of that?

20   A    Yes.

21   Q    If you could look at Exhibit 10 for me.  What is Exhibit 10,

22   Officer Crawford?

23   A    Exhibit 10 is a supplemental instruction sheet that I provide

24   to every person I supervise.  At the end of what we call an

25   intake or orientation with the judgment and going over the

1    conditions, I then provide each person with one of these, and go

2    through this page line by line.   In the third paragraph, it

3    advises each defendant to check with the local law enforcement

4    authorities regarding registration requirements.

5    Q   And is there a time limit when they're supposed to check with

6    the local law enforcement?

7    A   Yes.   Within 48 hours.

8    Q   And that's required by Nevada law?

9    A   Yes.

10   Q   Is this form Exhibit 10 something you gave to Mr. Miller?

11   A   Yes.

12   Q   And would that have been at the January 19th meeting, 2006?

13   A   Yes.

14   Q   Did Mr. Miller express any confusion to you about what he was

15   supposed to do?

16   A   No.

17   Q   Did he say he wasn't going to do this?

18   A   No.

19          MR. BLACKSTONE:   Your Honor, we would offer Exhibit 10.

20          THE COURT:   Admitted.

21          (Exhibit Admitted.)

22   BY MR. BLACKSTONE:

23   Q   Did Mr. Miller register within 48 hours like you told him to?

24   A   No, he did not.

25   Q   Has he ever registered?

A     Yes, he has.

Q     Do you know when that was?

A     December 22, 2006.

Q     That's about 12 months later?

A     Yes.

Q     Do you know why he registered on December 22nd of 2006?

A     He was arrested originally on this supervision violation on December 20th, and then released by magistrate judge later that day.  He came to the probation office, and my supervisor had -- I wasn't there, but it's my understanding my supervisor made mention of the registration requirement.  At which time, Mr. Miller advised him that he would research it.  And, two days later, he registered.

Q     Now if you could look for us at Exhibit 11 and tell us what that is.

A     That's the registration form that was provided by the Reno Police Department.

Q     And this is a form Mr. Miller filled out to register?

A     Yes.

Q     And the date is December 22nd of '06, two days after his arrest?

A     Yes.

                MR. BLACKSTONE:  Your Honor, we'd offer Exhibit 11.

                THE COURT:  Admitted.

                (Exhibit Admitted.)

1    BY MR. BLACKSTONE:

2    Q    Let me ask you, as I read Exhibit No. 10, it says:  You must

3    receive permission from probation office prior to any change in

4    residence or employment.  If convicted of a qualifying felony,

5    you must register with the police department in the jurisdiction

6    which you live every time you move within 48 hours.  It doesn't

7    say you must register, it says you must register every time you

8    move.  Officer Crawford, can you clarify that?

9    A    Yes.

10         Your Honor, in the state of Nevada, everyone convicted

11   of two or more felonies must register.  If they subsequently

12   move, they must reregister their new address with local

13   authorities as well.

14         THE COURT:  Was he told that he had an obligation to

15   register originally?

16         THE WITNESS:  Yes.

17         THE COURT:  When was that?

18         THE WITNESS:  January 19, 2006.  What I instructed him

19   specifically was to go to the local authorities.  Because he

20   lived in Reno city limits, he would either go to Reno Police

21   Department or the Washoe County Sheriff's Office to check

22   registering requirements.

23         THE DEFENDANT:  Can I make a statement here about that?

24         THE COURT:  You will have an opportunity here in just a

25   few minutes.

BY MR. BLACKSTONE:

Q   Let's direct your attention to violation 3, which alleges Mr. Miller associated with convicted felons.  Did you at some point become aware that Mr. Miller was associating with felons?

A   Yes.

Q   How was that, and when was it?

A   Initially, Mr. Miller advised me of that on March 22nd, 2001.

Q   What did he tell you?

A   He stated that he had been corresponding with federal inmates around the country.

Q   Did he say why he was corresponding with those inmates?

A   He stated something to the effect of providing legal research for them.

Q   And, when he told you this, what did you say to him?

A   I requested a list of these inmates.  And, after looking at this list, then later our office advised him to have no contact with anyone convicted of a felony as per the standard conditions in the judgment.

Q   Let me have you take a look at Exhibit 15 for me.  Do you have that in front of you?

A   Yes.

Q   What is Exhibit 15?

A   This is a letter that Mr. Miller provided to our office.

Q   And is this a letter you asked him to set forth as felons he had been having contact with?

1    A    Yes.  He lists four and then one additional one in a lower

2    paragraph.

3              MR. BLACKSTONE:  Your Honor, we would offer Exhibit 15.

4              THE COURT:  It will be admitted.

5              (Exhibit Admitted.)

6    BY MR. BLACKSTONE:

7    Q    After this -- I assume you said -- you told him not to have

8    further association with felons after this?

9    A    Correct.

10   Q    Did you uncover evidence indicating that Mr. Miller was

11   continuing to have contact with convicted felons after March of

12   '06?

13   A    Yes.

14   Q    And what evidence was that?

15   A    Later in the year, pursuant to an investigation, it was

16   revealed that he had been associating with other inmates in

17   addition to these listed here, as well as people who were

18   currently under indictment, and then also various people that

19   were under the supervision of the probation office.

20   Q    Did the probation department do a search of Mr. Miller's

21   business?

22   A    Yes.  December 20, 2006.

23   Q    And, during that search, did you and other agents or officers

24   find evidence that Mr. Miller was associating with felons?

25   A    Yes.

1   Q    What did that evidence consist of?

2   A    Numerous pieces of correspondence, letters, mail, envelopes,

3   also address books with offenders around the country at various

4   bureau of prison's facilities as well as offenders under our

5   supervision.

6   Q    If you could look for me at Exhibit 17.  And that's a

7   collection of letters.  And you've previously looked at Exhibit

8   17; haven't you, Officer Crawford?

9   A    Yes.

10  Q    Are all the items here in Exhibit 17 things that were taken

11  during the search of Mr. Miller's business?

12  A    Yes.

13  Q    If you could just direct your attention to the first letter

14  in that, who was that letter from?

15  A    That's from Lewis Vincent Hughes, who I believe is currently

16  incarcerated at SeaTac.

17  Q    And this is addressed to the Sam Group, attorney at law, 1105

18  Terminal Way, Suite 202 in Reno.  Who is the Sam Group?

19  A    Sam Group is a type of a consulting business based out of Las

20  Vegas for which Mr. Miller had stated that he was working for in

21  Reno.  So, essentially, at that Reno address, the Sam Group would

22  have been Mr. Miller.

23  Q    And the address 1105 Terminal Way.  Was this the address that

24  you associated with Mr. Miller?

25  A    Yes.

```
 1   Q    Was that the address you searched on December 20th?

 2   A    No, it is not.

 3   Q    What address did you search?

 4   A    We searched 491 Court Street in Reno.

 5   Q    And what is the postmark on this letter from Lewis Vincent

 6   Hughes to the Sam Group?

 7   A    The date is July 13th, 2006.

 8   Q    So this is after you told him to stop having association?

 9   A    Yes.

10   Q    And the next page is a letter to -- it's the enclosure that

11   was in the envelope?

12   A    Yes.

13   Q    Stating his charge?

14   A    Yes, I believe so.

15   Q    I won't go through all these, but are there other letters in

16   here from convicted felons?

17   A    Yes.

18   Q    Is there a letter here from someone named Holtzclaw

19   incarcerated in Arkansas?

20   A    Yes.

21   Q    Is he a convicted felon?

22   A    Yes.

23   Q    And is there a letter in here from someone named Michael

24   Staggs?

25   A    Yes.
```

1   Q    And is he also a convicted felon?

2   A    Yes.

3   Q    Is there a letter in here from an Albert Johnson?

4   A    Yes.

5   Q    Is he also a felon?

6   A    Yes.

7          MR. BLACKSTONE:  Your Honor, we'd offer all the letters

8   that are in Exhibit 17.

9          THE COURT:  They'll be admitted.

10          (Exhibit Admitted.)

11   BY MR. BLACKSTONE:

12   Q    Do you supervise someone named Matt Bardasian?

13   A    Yes, I do.

14   Q    Who is he?

15   A    He is an offender that we supervise.  He was convicted in the

16   Central District of California on numerous fraud charges.

17   Q    And have you talked with him about any association he might

18   have had with Charley Miller while Mr. Miller was under your

19   supervision?

20   A    Yes, I have.

21   Q    What has he told you about that?

22   A    He advised me that he first met Mr. Miller at the federal

23   halfway house in Reno in December 2005.  That they both began

24   supervision at approximately the same time, early 2006.  They

25   maintained regular contact multiple times in a month, and he

1    would also provide thousands of dollars to Mr. Miller.

2    Q    Did Bardasian provide you proof of providing this money to

3    Mr. Miller?

4    A    He wrote out a statement, and a simultaneous search of Mr.

5    Bardasian's personal residence on December 20th revealed copies

6    of checks and those sorts of things.

7    Q    Why was he giving money to the defendant?

8    A    Well, he stated it was simply to keep Mr. Miller at bay.

9    Q    And did he indicate whether he provided any office space to

10    Mr. Miller?

11    A    Yes.

12    Q    And where was that office located?

13    A    That office was at 491 Court Street.

14    Q    And why did he do that?

15    A    Mr. Bardasian originally obtained the lease on that office

16    space which was then not used, and he turned the office space

17    over to Mr. Miller for his use.

18    Q    And whose name appeared on the lease?

19    A    Mr. Bardasian's name appeared on the lease, and he stated

20    that he continued to pay the rent throughout the term.

21    Q    Did Mr. Bardasian indicate how often he had contact with Mr.

22    Miller?

23    A    He did.  It was several -- multiple times in a month.  It

24    wasn't regular.

25    Q    Over what time frame are we talking about?

```
 1   A    Throughout the 2006.

 2   Q    And did Mr. Bardasian provide you with a witness statement?

 3   A    Yes, he did.

 4   Q    Is that statement in your book there as Exhibit 18?

 5   A    Yes.

 6   Q    And that's the statement he gave to you?

 7   A    Yes.

 8   Q    Has he been violated?

 9   A    Yes.

10   Q    And do you know what the status of that is?

11   A    He is pending revocation proceeding in the Central District

12   of California.

13   Q    Have you promised him any leniency for his cooperation?

14   A    No.

15   Q    Is he hoping to get something out of you?

16   A    He is hoping, yes.

17   Q    You have made no promise to him?

18   A    Correct.

19             MR. BLACKSTONE:  Your Honor, we offer Exhibit 18.

20             THE COURT:  It will be admitted.

21             (Exhibit Admitted.)

22   BY MR. BLACKSTONE:

23   Q    Let me direct your attention to violation 4, which alleges

24   Mr. Miller submitted false monthly reports.  Officer Crawford,

25   what are the false statements in the monthly reports?  Just give
```

 1   us a general view of a couple of reports.

 2   A   A monthly report is essentially two pages, front and a back.

 3   It asks for employment information and wages, other cash in-flows

 4   on the front page.  And most of these indicate that Mr. Miller

 5   was working for the Sam Group.  The first one indicates a

 6   gross --

 7   Q   Let's make the record clear, you're looking at Exhibit 20?

 8   A   Yes.

 9   Q   And that's a monthly report for what month now?

10   A   It's listed as February 2006.

11   Q   And is that report signed by Mr. Miller on page 2?

12   A   Yes, it is.

13   Q   And is that a report he would have provided to you in the

14   normal course of supervision?

15   A   Yes.

16           MR. BLACKSTONE:  Your Honor, we'd offer Exhibit 20.

17           THE COURT:  It will be admitted.

18           (Exhibit Admitted.)

19   BY MR. BLACKSTONE:

20   Q   Let's tell us, what are the false statements on this report,

21   Officer Crawford?

22   A   On the front page, it indicates the Sam Group paid him a

23   gross wage of $4,000.  Further investigation and interview with

24   the Sam Group revealed that they had not paid him.

25           Also, a little bit further down, other cash in-flows is

 1    left bank.

 2              And then on page it --

 3    Q    What's false that?  Did he get other cash he didn't report?

 4    A    Mr. Bardasian had been providing him with cash throughout the

 5    year.

 6    Q    Is there a false statement on page 2 of Exhibit 20?

 7    A    Yes.  Page 2 is a series of questions.  One question:  Did

 8    you have any contact with anyone having a criminal record.  And

 9    he marked box:  No.

10    Q    And do you believe that's false?

11    A    Our investigation revealed that not only had he been

12    associating with Mr. Bardasian but numerous other convicted

13    felons both in and out of custody.

14    Q    Exhibit 21, can you identify that for us.

15    A    21 is a monthly report dated March 21, 2006.

16    Q    Is that signed by Mr. Miller?

17    A    Yes, it is.

18              MR. BLACKSTONE:  Your Honor, we'd offer Exhibit 21.

19              THE COURT:  It will be admitted.

20              (Exhibit Admitted.)

21    BY MR. BLACKSTONE:

22    Q    What are the false statements on this document, Officer

23    Crawford?

24    A    Also gross wage, employed by the Sam Group, other cash

25    in-flows indicates zero.  On page 2:  Did you have --

1   Q    Why is that false?

2   A    Again, Mr. Bardasian had been providing him with cash.

3   Q    And page 2.

4   A    Page 2:  Did you have contact with anyone having a criminal

5   record.  He did indicates:  Yes, see attached.  And he has

6   attached a memorandum of record dated March 21, 2006, listing a

7   total of five convicted felons.  However, he was also associating

8   with felon Matt Bardasian, felon Cal Mizell and felon Joe Norris.

9   Q    How do you know he was associating with Mizell and Norris?

10  We haven't mentioned them before.

11  A    Our investigation and interview with Mr. Bardasian and also

12  with Mr. Norris.  Mr. Mizell is an offender I also used to

13  supervise, and his vehicle was observed at Mr. Miller's

14  residence.  And cooperating witnesses advised that he had been

15  associating -- that Mr. Miller and Mr. Mizell had been

16  associating.

17  Q    Did Mr. Norris actually tell you that he had been associating

18  with Mr. Miller at this time, which is March of '06?

19  A    I interviewed Mr. Norris just a couple weeks ago, and he

20  indicated that he had been associating with Mr. Miller throughout

21  the year last year.

22  Q    The remaining reports are Exhibits 22 through 27.  Have you

23  previously looked at all those monthly reports?

24  A    Yes.

25  Q    And are those all reports signed by Mr. Miller presented to

1  you in the course of his supervision?

2  A   Yes.

3       MR. BLACKSTONE:   Your Honor, we'd offer exhibits 22

4  through 27.

5       THE COURT:   They will be admitted.

6       (Exhibits Admitted.)

7  BY MR. BLACKSTONE:

8  Q   And, on each of those reports, do they contain the same false

9  statements related to the income and association with felons?

10 A   Yes.

11 Q   I just want to direct your attention to two of them.   Exhibit

12 24, which is a June '06 report on page 2, Mr. Miller does

13 indicate that he had contact with somebody who has a criminal

14 record identified as Lewis Hughes.   What is false about that

15 statement, Officer Crawford?

16 A   There were numerous other felons that Mr. Miller was having

17 contact with.

18 Q   And then, on Exhibit 26, the August '06 report, Mr. Miller

19 again does admit that he had had contacts with LV Hughes, called

20 him?

21 A   Correct.

22 Q   What's false about that?

23 A   He does not include the numerous other felons he had contact

24 with.

25 Q   Let me direct your attention to let's talk about violation 5,

1   the failure to provide you with requested financial information.

2   When you met with Mr. Miller in January of '06, did you request

3   any financial information from him?

4   A    Yes, I did.  I requested income tax documents as well proof

5   of income from his employer.

6   Q    Why did you want that information?

7   A    Standard information that we acquire from offenders under our

8   supervision to ensure compliance with the law.

9   Q    When you requested that information of Mr. Miller, what did

10  he say to you?

11  A    He advised that he was not required to pay income taxes, that

12  he would at some point obtain proof of his income.

13  Q    Did he ever provide you with proof of his income?

14  A    He provided one typed page, which in my opinion was not

15  legitimate proof of his income.

16  Q    Did he provide you with any income tax information?

17  A    No.

18  Q    Are you aware, has he filed tax returns since he was

19  supervised?

20  A    To my knowledge, he has not.

21  Q    If you could look at Exhibit 30 and tell us what that is.

22  A    It's a memorandum of record for Mr. Miller.

23          MR. BLACKSTONE:  Your Honor, we offer Exhibit 30.

24          THE COURT:  It will be admitted.

25          (Exhibit Admitted.)

```
 1   BY MR. BLACKSTONE:
 2   Q   In this letter, he indicates he doesn't have to file income
 3   tax; correct?
 4   A   Correct.
 5   Q   He says he's actually talked to someone named Ms. Anderson at
 6   IRS, and he directs you to look at Internet publication 15.   Did
 7   you have any information that Mr. Miller was supposed to file
 8   taxes?  This was April 15th; correct?
 9   A   Correct.  His initial monthly report, he indicates a gross
10   income of $4,000 a month.
11   Q   And were you aware that he had any other money coming to him
12   during the course of 2006?
13   A   Not initially, but our investigation revealed that a -- what
14   became then a girlfriend, she started funding Mr. Miller as well
15   as Mr. Bardasian.
16   Q   Did you contact a lady at the IRS to see if Mr. Miller had
17   actually talked to her?
18   A   No, I did not.
19   Q   Have you made any effort to see if he has to file or not?
20   A   No, I have not.
21   Q   Let me direct your attention to violation 6 which alleges Mr.
22   Miller failed to respond truthfully to and follow the instruction
23   of his probation officer.  First, tell us what things he lied to
24   you about.  And why you believe he lied to you.
25   A   Well, on the issue of associating with other convicted
```

1    felons, he been associating regularly throughout the year, never

2    provided any of that information to the probation office.   In

3    addition to that, he reported that the Sam Group was his

4    employer, set his office up in Reno.   The Sam Group advised me

5    that they never provided him with any funding whatsoever in 2006.

6         Another issue of the first traffic violation on April 2,

7    2006, when he was first confronted with it, he initially denied

8    having any contact with law enforcement, until I prodded him

9    further.

10   Q    How about where his business was located, was he truthful

11   with you about that?

12   A    He continued to use the address on Terminal Way.   However, it

13   came to our attention that he was using the address that was

14   leased by Mr. Bardasian at 491 Court Street.

15   Q    And did he ever provide that address to you?

16   A    No.

17   Q    Now, in terms of failing to follow your instructions, did you

18   indicate to Mr. Miller that he needed to get a driver's license

19   if he wanted to drive in the state of Nevada or anywhere else?

20   A    Yes, I did.

21   Q    What was his response to that?

22   A    His response was that he was not required to have a driver's

23   license.

24   Q    Do you have any of evidence that he did in fact drive without

25   getting a driver's license, contrary to what you told him to do?

1    A    Yes.

2    Q    What's that evidence?

3    A    One point, he admitted to driving from Reno to Seattle in

4    July of 2006.  In addition to that, I obtained a copy of a second

5    traffic violation June 7th, 2006.

6    Q    And did he admit to you that, when he drove from Reno to

7    Seattle, he did not have a driver's license?

8    A    Yes, he did.

9    Q    And you found no evidence that he ever obtained a driver's

10   license from Nevada or any other state; is that correct?

11   A    That's correct.

12            MR. BLACKSTONE:  Thank you.  I have nothing further of

13   Mr. Crawford.

14            THE COURT:  Mr. Miller, do you wish to ask questions of

15   the witness?

16            THE DEFENDANT:  Yes, but I'd like to make some comments

17   first.

18            THE COURT:  No.  Ask him.

19            THE WITNESS:  My contention is the supervised release

20   agreement was invalid from day one.

21            THE COURT:  Do you want to ask questions of the witness?

22            THE DEFENDANT:  Pardon?  If I ask questions of a

23   witness, I need a legal determination here so I don't waive any

24   of my rights.  If I ask questions of the witness without stating

25   my defense and the issues that I have to raise here, do I lose

1    any rights?

2           THE COURT:  I'm not here to answer your questions.

3           THE DEFENDANT:  You can't give me a legal determination,

4    sir?

5           THE COURT:  No, sir, I can't.

6           THE DEFENDANT:  Yeah.  Then I need to ask Mr. Crawford

7    some questions, but they're basically framed as announcements.

8    And they're framed to the administrator of this court.

9           I appear specially by restricted appearance Rule 8 --

10   Rule E8 supplemental rules, and I claim any rights that may have

11   been assumed to have waived without prejudice and without

12   recoursement.

13                      CROSS EXAMINATION

14   BY MR. MILLER:

15   Q   Now, Mr. Crawford, will --

16          MR. CRAWFORD:  Now, I can't stand up.  I'm sorry, I

17   can't stand up too well today.

18          THE COURT:  All right, go ahead.

19          MR. MILLER:  I have some back problems.

20   BY MR. MILLER:

21   Q   Mr. Blackstone didn't establish what your capacity -- you are

22   a federal officer; is that correct?

23   A   Correct.

24   Q   And you've had training as a federal officer?

25   A   Correct.

1   Q    And you've had also college as well?

2   A    Correct.

3   Q    You've had legal training as a federal officer?

4   A    Some, yes.

5   Q    And what would that training consist of?

6   A    On-the-job training and classroom training.

7   Q    Okay.  And what were the classroom training be related to?

8   A    All aspects of parole and probation supervision including

9   presentence reports, guidelines and various federal statutes.

10  Q    Okay.  And which federal statutes would they be related to?

11  Supervised release only, to probation office, or others as well?

12  A    Numerous federal statutes.

13  Q    Okay.  Would you say that you have a basic understanding of

14  the law of the United States in order to serve in your position?

15  A    Yes.

16  Q    Okay.  Then you're aware that you have signed an oath to the

17  Federal Constitution?

18  A    Well, I'm not aware of that specifically, no.

19  Q    Let's see if I can find the form here, I've got the number

20  somewhere.  It's called an Appointment Affidavit Standard Form 61

21  revised September 1970 US Civil Commission.

22        THE COURT:  You have to slow down, Mr. Miller, so the

23  court reporter can take it down.

24        MR. MILLER:  I'm sorry.

25  BY MR. MILLER:

1    Q    The Standard Form 61 revised September 1970 US Civil Service

2    Commission chart.  They are 295 approval of the OMB as 50-I

3    believe it's RO 118.  And this is required under all -- under for

4    all federal employees.  And you don't remember sighing it, sir?

5    A    I don't.  I started with the federal government seven years

6    ago.

7    Q    All right.  Part of the oath is:  I will support and defend

8    the constitution of the United States against all enemies,

9    foreign and domestic, and I will bear truth and falsity alone to

10   the same and make that obligation freely without mental

11   reservation or purpose of evasion, and that I will well and

12   faithfully discharge the duties of office I'm going to tender.

13           So does that say, Mr. Crawford, that you have an

14   obligation to the constitution and its limits or powers?

15   A    Well, what you read there, yes.

16   Q    Did you also have a certificate of appoint being given to you

17   appointing you to your office?

18   A    Yes.

19   Q    Who issued your certificate of appointment?

20           MR. BLACKSTONE:  Your Honor, I would object.  This is

21   not relevant.

22           THE COURT:  Sustained.

23   BY MR. MILLER:

24   Q    So do you have a certificate of appointment --

25           MR. BLACKSTONE:  Objection.

```
 1              THE COURT:  Sustained.
 2              MR. MILLER:  I would take exception to that.  It is
 3    relevant that Mr. Crawford have the capacity to answer the
 4    questions.  And the questions are, I'm going to raise, would go
 5    to his being a proper officer with complete documentation.  I've
 6    attempted to obtain his documentation while I've been in jail,
 7    but it's been very slow coming.  I do have some offers of
 8    documentation here, but not all.
 9              THE COURT:  Ask another question, Mr. Miller.
10              MR. MILLER:  The exception is noted, and thank you.
11    BY MR. MILLER:
12    Q   One of the outlines of your job description is to assist a
13    federal inmate on supervised release under your care?
14    A   Yes.
15    Q   Does that include, is it listed in the statute, medical
16    attention or any kind of specific detention?
17              MR. BLACKSTONE:  Objection, relevance.
18              THE COURT:  Sustained.
19              MR. MILLER:  I'll take exception to that one as well.
20              THE COURT:  I'll tell you what, we'll have a deal.  I
21    just assume you except to every objection I sustain; okay?
22              MR. MILLER:  All right, that's fine.
23              THE COURT:  Okay, good.
24    BY MR. MILLER:
25    Q   Going to the search of the office at 491 Court Street,
```

December 20th, the items that you took out of that office were

mail receipts, receipts to Switzerland and the Netherlands, Great

Britain and the Vatican; and Express mail receipt from the

supreme Court; and also mail receipts to other parties; is that

correct?

A    Yes.

Q    And were the list of other parties, were those state and

federal offices?

A    I'm sorry, I don't understand the question.

Q    Was the list that you took from the office there of the

parties served, the paper, legal papers, state and federal

offices?

A    There was a list with state and federal officials and

addresses.

Q    Okay.  So you were aware that documents that had been put

into the federal system and served in fact on this Court to Mr.

Lasnik, to the chief clerk, and to Mr. McKay, who is I believe at

that time to be the US attorney, you took those from the office;

is that correct?

A    The items were seized by the team put together by the

probation office.

Q    Okay.  And under what section of the probation authorization

for searching someone's house is it authorized to take federal

documents or serve documents?

A    There's a special condition in the judgment issued in this

1   case that allows search and seizure.

2   Q   Yes, that's correct.

3            And what does it allow search and seizure for?

4   A   A special condition read that the defendant shall submit to

5   search of person, residence, office, property or vehicle

6   conducted in reasonable manner and a reasonable time by the

7   probation office.

8   Q   Okay.  Since I wasn't there, I really couldn't have too much

9   to do with it; now could I?  So you searched for that without a

10  search warrant and took documents filed in the international

11  courts and the courts of the United States and in the state

12  offices; is that correct?

13  A   Can you repeat the question?

14  Q   So you took from, under this search section, without a

15  warrant, you had the right to search.  You cannot identify any

16  rights to steal documents that have been served on state and

17  federal officers, international officers, courts of the United

18  States, including a Reno district court that you're employed by;

19  is that correct?

20  A   The search team seized the documents under the search

21  condition imposed by this Court, as well as Mr. Bardasian's very

22  specific search condition at Central District of California.

23  Q   You still haven't answered the question.  What authority did

24  you have to take federally filed documents that had been served

25  on the United States Supreme Court, Congress and this Court in

```
 1   particular and the court of Reno?

 2            MR. BLACKSTONE:  Objection, asked and answered.

 3            THE COURT:  Sustained.

 4   BY MR. MILLER:

 5   Q   I make you aware, Mr. Crawford, of 18 USC 2071, concealment,

 6   removal of or mutilation generally.  Whoever willfully conceals,

 7   removes --

 8            MR. BLACKSTONE:  Objection, relevance.

 9            THE COURT:  Sustained.

10            MR. MILLER:  I'm trying to get to -- I take extreme

11   exception here to the credibility of this witness for certain

12   statements.

13            THE COURT:  Ask another question.

14            MR. MILLER:  Mr. Crawford is committing felonies, and

15   you're not letting me to register this on the record.

16            THE COURT:  Ask another question.

17            MR. MILLER:  I'll take extreme exception to that.  And,

18   while I knew kangaroo courts were still alive, I didn't know this

19   was still alive.

20   BY MR. MILLER:

21   Q   Are you familiar with USC 285 --

22            MR. BLACKSTONE:  Objection.

23            THE COURT:  Sustained.

24            MR. MILLER:  For the record, I take exception to that.

25   That's also a five year felony or $5,000 which says that any
```

1   papers that have been served on United States are taken.

2            So I believe the credibility of this witness leaves a

3   little something to be desired.  That's number one.  And let's

4   see.

5   BY MR. MILLER:

6   Q   Mr. Crawford, are you aware of the Sixth Amendment?

7            MR. BLACKSTONE:  Objection, relevance.

8            THE COURT:  Sustained.

9            MR. MILLER:  So are you stating, Mr. Coughenour, the

10  Sixth Amendment is not relevant in this court?

11           THE COURT:  I am not answering your questions, Mr.

12  Miller.

13           MR. MILLER:  And you're not going to let me ask Mr.

14  Crawford questions that are related to my issues that I choose to

15  raise before this Court in my defense in this?  What kind of

16  hearing is this?  Is this a Rule 32 hearing --

17           THE COURT:  Ask another question.

18           MR. MILLER:  Let's show authority record here that this

19  is a Rule 32 hearing.  The court administrator has been invoked.

20  I would like a witness.  Is there anybody here who is witnessing

21  the violation of civil rights?  I'm going to request that US

22  marshals here and the court today to file affidavits based on a

23  right of violation of civil rights here.  I'm unable to establish

24  a record where the witness admitted on the stand violation of two

25  United States code felony sections.

```
 1              Let's see.  I need a minute to think about this.  But I
 2    certainly didn't expect this.  You know, the papers we served on
 3    the Supreme Court of the United States was that we believed that
 4    we could find honest judges, but apparently that's not so today.
 5    You're denying me the ability to defend myself how I see fit to
 6    defend myself within the rules.  You're denying me the ability to
 7    cross examine a witness.  And you're denying me the ability to
 8    establish evidence of felonies when the evidence of felonies is
 9    written down in the evidence used against me.  So let me look at
10    my notes here for a second, and we'll --
11    BY MR. MILLER:
12    Q    Yes, Mr. Crawford, on the tax matter.  Were you not in fact
13    served registered mail with a notice that the IRS publication
14    stating that the amount, the minimum amount for filing
15    requirements?
16    A    I don't know if it was registered mail.  You had provided our
17    office a copy of a page regarding Internal Revenue Service
18    requirements.
19    Q    Internet publication 17 by Ms. Anderson, who you said you did
20    not contact.  And, Mr. Crawford, does this make sense to you, I
21    didn't get out of prison until February 19th, 20th, with you?
22    How could I file for 2005?  Okay, I hadn't begun work until late
23    January.  And you're trying to get me to file for a year that
24    didn't exist and it still -- April 15th for 2006 still is not
25    here.  So how did I make any false statements?  And can you
```

1   please explain to me how you feel threatened by an IRS

2   publication?

3   A    I don't feel threatened by an IRS publication.  However, to

4   clarify the issue for you, you were released to the federal

5   halfway house in Reno, Nevada on September 27, 2005.

6   Q    Correct.

7   A    Some later date, I believe they allowed you to complete your

8   term of imprisonment via house arrest at your residence on Sixth

9   Street in Reno.  When I first met with you --

10  Q    Middle of February, yeah.

11  A    I'm sorry?

12  Q    The middle of February.

13  A    For what?

14  Q    For the halfway house -- allowed me to go to the halfway

15  house the middle of February; right?

16  A    Okay.  However, our jurisdiction began when supervised

17  release began on February 22nd, 2006.  When I met with you on

18  January 19th, 2006, you had indicated both verbally and in

19  writing that you had a net income of $4,000 per month.

20  Q    No.  That was projected, if I recall.  And I think there was

21  a note -- also, to return to the issue of the items taken from

22  the 491 Court seizure, was there not a file taken there that's

23  not listed here, my client probation file with all the

24  documentation we had between each other?

25  A    I don't know offhand.

1    Q    Were you there at the theft?

2    A    I'm sorry?

3    Q    Were you at 491 Court Street on the 20th?

4    A    Yes, I was.

5    Q    And you don't remember taking the probation file that had all

6    of the documentation that was served on you and every

7    correspondence between us?

8    A    I don't remember specifically.  There were several documents.

9    Q    All right.  And who made the inventory of that to begin with,

10   the items taken from the office?

11   A    The seized items?

12   Q    Yeah, uh-huh.

13   A    Were done by a supervisor in the probation office, as well as

14   the list typed up by myself.

15   Q    I'll reserve that issue for later.

16        Now, let's go to one other issue, Mr. Crawford.  Since

17   you've had a little bit of legal training, and supervise people

18   all the time, and you deal with government contracts, if there's

19   a violation of law not found not a valid contract.

20        MR. BLACKSTONE:  Objection --

21        THE COURT:  Sustained.

22        MR. MILLER:  Good.  What is relevant here?  Can I get a

23   determination of that?

24        THE COURT:  I'm not here to answer your questions, Mr.

25   Miller, and I'm not going to.

 1          MR. MILLER:  Is there a reason you don't answer motions

 2    to the Court as well?

 3          THE COURT:  Ask another question, Mr. Miller.

 4          MR. MILLER:  Boy, that's pretty interesting.

 5    BY MR. MILLER:

 6    Q   Mr. Crawford, you mentioned three or four times during your

 7    examination by Mr. Blackstone that you had other parties that

 8    have provided information.

 9    A   Correct.

10    Q   Where are those parties today?

11    A   I don't know where they are today.

12          MR. MILLER:  Then I move to strike all of your testimony

13    related based upon any of those parties that are not here because

14    I can't cross examine them.

15          THE COURT:  The motion is denied.

16          MR. MILLER:  Is there a reason for the denial?

17          THE COURT:  I'm not here to answer your questions, Mr.

18    Miller.

19          MR. MILLER:  Will you comply with the rules issuing me a

20    finding of fact and a conclusion of law for the denial?

21          THE COURT:  No.

22    BY MR. MILLER:

23    Q   You're aware that the Ninth Circuit filed a mandamus on the

24    district court in Nevada, No. 0770266 for the return of the some

25    of the items that you stole?

1    A    I'm sorry, are you talking to me?

2    Q    Yes.

3    A    No, I'm not aware of any of that.

4    Q    All right.  For the record here, this court is also --

5    mandamus has been filed with the Ninth Circuit, 0770223, it is

6    still active as of last night, dealing with these issues.

7              MR. MILLER:  And, the objection that was just sustained,

8    I take an exception to on the contract issue.

9    BY MR. MILLER

10   Q    As far as Mr. Mizell, are you aware that his federal

11   conviction was overturned and wiped out completely?

12   A    Yes, I am.

13   Q    That he's not a felon?

14   A    That's incorrect.

15   Q    And what's he a felon from then?

16   A    He has a prior nonfederal conviction.

17   Q    I wasn't aware of that.

18             In our conversation, Mr. Crawford, did we have a

19   conversation about the driving statutes relating to commerce

20   driving statues only?

21   A    We did.

22   Q    And did I advise you that I was not commerce driving?

23   A    You made a statement regarding that.

24   Q    And I did advise as to the statutes of Washington, Oregon,

25   California and Idaho as to the issues regarding commercial

1  driver's statutes?

2  A    You may have, I don't remember.

3  Q    If you don't remember getting them, you couldn't have well --

4  very well remembered them.   Otherwise, you'd probably remember.

5        And are you aware of 18 USC 3584 Section C, treatment of

6  multiple sentences aggregate as a single sentence.

7        MR. BLACKSTONE:   Objection, relevance.

8        THE COURT:   Sustained.

9        MR. MILLER:   This goes to one of the issues of the state

10  of Nevada.   It says more than one felony, you're not required to

11  report.   I'll make a sworn statement here that I requested from

12  the director of Bantom House and Mr. Todd White whether I was

13  required to register as a felon before I left the halfway house.

14  I was told by both of them, because of 3584, No.   When I became

15  aware of that fact for the first time I reviewed it, I was under

16  threat when you typed up for the felon's program, and I'm still

17  under threat, and I've notified the state of the same.   Because

18  you have a conflict between a state and a federal law, and I'd

19  like someone to tell me which one supersedes.   Only one sentence

20  under the federal law, and it can be construed as more sentences

21  under the federal or under the state.   So we've got a conflict,

22  and I'm being penalized for.

23        I don't think I have no more questions for Mr. Crawford.

24        THE COURT:   All right, you may step down.

25        Anything further, Mr. Blackstone?

1           MR. BLACKSTONE:  No.  The government rests.

2           THE COURT:  Would you wish to put on any evidence?

3           THE DEFENDANT:  I do.  I have a certain number of

4    statements to make.  I'm really confused here.  I don't

5    understand the political states that's assumed for me because I

6    know I come in peace and operate under the rules and have not

7    received the benefit.

8           Is there a witness here provided by the court

9    administrator?  No?  Let the record show that there is no witness

10   here.

11          That all everything that I've said here today and that

12   has been said here is directed to the court administrator.  I'm

13   not the party identified in any of the papers here today or at

14   any time other than my own.  I have not been identified by anyone

15   here today, and there is no record anywhere that I am not who I

16   say I am and that there has been a record of evidence in any

17   tribunal deciding facts or law that evidences my identity other

18   than who I say I am.

19          My lawful birth name was given to me by my parents.

20   It's not a state construction.  It's my true name.  It's very

21   well of this Court -- very well aware of this Court of the items

22   of my name and different items.  I established a good record of

23   that 1987.  By name, all my rights without prejudice without

24   recourse.

25          Failure to recognize me as my rights --

1          MR. BLACKSTONE:  I'm going to object this, has nothing

2    to do with what we're here for.

3          MR. MILLER:  Excuse me, Mr. Blackstone?

4          THE COURT:  No, no, no.  Mr. Miller, I'll deal with

5    this.

6          The objection is overruled.

7          Go ahead.

8          MR. MILLER:  Thank you.  Failure to recognize me and my

9    rights and capacities as standing at attention to enforce and

10   create servitude of involuntary nature.  I am being held to being

11   a US citizen, a personal slave.

12          Now, the evidence I have to submit today is, first of

13   all, I have an appointment affidavit for John C. Coughenour with

14   an oath of the Oregon case against -- strike against federal

15   government affidavit against purchase for the sale of office

16   signed by a notary public 7/27/82 where Mr. Coughenour swears to

17   uphold and defend the federal constitution.

18          I have an oath of office form No. G22 revised 11/2/70

19   title 28SV to attachment 58 Section 3331 United States Codes

20   where Mr. Coughenour says that he will support and defend the

21   Constitution of the United States against all enemies, foreign

22   and domestic and uphold the laws of the United States.  There's a

23   certificate of appointment here from the Senate and a certificate

24   of appointment from the United States' Office of the President.

25   Therefore, Mr. Coughenour is of record having service to the

```
1    United States' Federal Constitution and to provide the benefit of

2    its law to anyone who comes before him.  I do not have a

3    certificate of appointment defining the branch of government Mr.

4    Coughenour's appointed to.  For some reason, that's being hidden.

5    That's Exhibit 1.  Will you accept that?

6              THE COURT:  Yes.

7              MR. BLACKSTONE:  No objection.

8              MR. MILLER:  Would you like me to give it to the clerk,

9    Your Honor?

10             THE COURT:  Yes.

11             THE CLERK:  Exhibit A1 is marked for identification.

12             MR. MILLER:  I have here as Exhibit 2 a series of cases,

13   it starts with the rule of *Apprendi vs. New Jersey*, 2000 530 US

14   466, outline of annotation stating that therefore there's a

15   violation of the Sixth Amendment.  It voids the action underneath

16   it.  That's based upon that violation.  That would be then we

17   have *United States vs. Booker*, and I'll quote from Booker, which

18   is 543 US 220 S60 LAD second, United States prime charters to the

19   federal constitution required that any fact other than prior

20   conviction which is necessary to support a sentence exceeding the

21   maximum authorized by fact established by a plea of guilty or

22   jury verdict must be admitted by the defendant or proved to a

23   jury beyond a reasonable doubt.  Sixth Amendment right to a trial

24   by jury, any act increases a penalty for a crime beyond a

25   prescribed mandatory maximum must be submitted to a jury and
```

1   proved beyond a reasonable doubt.

2           The next issue is -- these are just the headnotes.  We

3   have the civil suit.  Under the civil case No. 2:06 MJ 0097 RAM

4   and AWL in the United States District Court, District of Nevada,

5   Reno district, which is a semblance wherein I filed a countersuit

6   against Mr. Coughenour and the civil action was docketed by Reno

7   district court.  The Reno District Court has transferred that

8   here.  This exhibit was served on the court by the United States

9   district court, particularly magistrate McQuade of Reno, Nevada.

10  This is Exhibit 3.

11          So we've established now that the Sixth Amendment is

12  valid in this Court by order of the Supreme Court for sentencing

13  issues, and that the issues have been raised as they've been

14  raised before.

15          Now, the next issue is that the -- will you accept that

16  as an exhibit?

17          THE COURT:  Yes.  It will be Exhibit No. 2.

18          THE DEFENDANT:  Exhibit No. 3 is a transcript, November

19  12, 1999, United States of America, the plaintiff, vs. Charles C.

20  Miller, defendant, all caps by the way, CR97-51C, appeals number

21  98-30058.  At page 9, Mr. Coughenour, the sentencing judge.

22  First of all, the obstruction question, the Court must find the

23  defendant gave false testimony concerned with the material matter

24  at the trial with the intent to provide false testimony rather

25  then a result of confusion, mistake, due to faulty memory.

1          THE COURT:  Would you slow down, Mr. Miller?  You've got

2   to slow down so the court reporter can get it all down.

3          THE DEFENDANT:  I'm sorry.

4          First of all, on the obstruction question, the Court

5   must find that a defendant gave false testimony in concern with

6   the material matter with a willful intent to provide false

7   testimony rather than as a result of confusion, mistake or faulty

8   memory, and I do make those findings.

9          Further down on page 9, the testimony was clearly false,

10  it was a vivid display to be false, and a tape recording of Mr.

11  Schweitzer was played.  Page 10, first line:  I find therefore

12  the total offense level is 30 by resulting in a guideline range

13  as 97 to 121 months, the count of conviction that he will indeed

14  re-offend when he gets out, and that all the reasons that I

15  stated for upward departure originally are valid reasons for the

16  high-end sentence.

17         Now, this is Exhibit 3 showing conclusive proof there's

18  a predisposition here -- by the way, for the record, I did not

19  file or request that you be recused, Mr. Coughenour.  You did

20  that yourself.  But I will be requesting that here in the future.

21         THE COURT:  You want that marked as Exhibit No. 3?

22         MR. MILLER:  Yes.  This is marked as Exhibit No. 3 as

23  proof by this own record.

24         Also, for the record, the Indictment is part of the

25  record at this point.  It does not show any charge for

1    obstruction or false statements that you assessed on your own

2    after the fact of finding by the trial.  And the appeals court --

3            THE COURT:  Exhibit 3 will be admitted.

4            (Exhibit Admitted.)

5            MR. MILLER:  That's Exhibit 3.

6            Now to go to Exhibit 4.  These are copies from the

7    prison library of 18 USC Section 371 which I was charged with

8    originally and fraudulently, so -- in my own opinion and still

9    being tested now -- the only penalties authorized for conspiracy

10   is fine or imprisonment.

11           Exhibit 2 is a mail fraud and wire fraud, Statutes 1341,

12   where a person shall not be fined more than $1,000 or imprisoned

13   not more than 30 years.  Fined or imprisoned again.

14           Same with 1344 Title 18, Section 3551 authorizes

15   sentencings, limited the authorization of sentences to probation

16   imprisonment and that's it.  A fine.  Which complies with the

17   statute as charged.

18           Part of the exhibit is the footnotes in 3551 explaining

19   that why it was put into place that way.  And, for reference to

20   imposition of a sentence to 3553, which still requires

21   application of the guidelines which at the time of 1997 the

22   guideline sentence for what was charged what was heard under the

23   jury trial was 24 to 31 months.

24           Let's see.  Then we come to Title 18 3583 wherein the

25   sentence to supervised release may include a -- supervision may

1    be included by the Court as part of a sentence.  The only

2    authorized sentences to me or for me have been fine or

3    imprisonment.  I've paid the debt at law, served the prison time,

4    whether it was legal or not.  The authorized term for supervised

5    release could not set up a contract as being determined here

6    today.  That's Exhibit 4.  Will the Court accept those?

7                    THE COURT:  Yes.

8                    THE DEFENDANT:  All right.

9                    Now we come to Exhibit 5.  These are -- as a matter of

10   record, I asked the probation office to provide me with copies of

11   the Presentence Report so I could have that as an exhibit and

12   show the proof of the points.  But I suspect everyone can find

13   that very conveniently.

14                   THE COURT:  I have a copy of it.

15                   THE DEFENDANT:  All right.  If I remember correctly, the

16   1995 guidelines for what was used to sentence me.  Do you

17   remember that, Mr. Coughenour?

18                   THE COURT:  I'm not here to answer your questions, Mr.

19   Miller.

20                   THE DEFENDANT:  Okay.  The 1995 guidelines state that in

21   the revocation of probation issues, that it's a civil issue

22   dealing with matters of trust, a contract.  Now, if you'll

23   notice, the contract has my name on it, is signed by the official

24   by authorized agent, which is me.

25                   Now, since we have a trust issue here, this is Exhibit 4

1    or 5, the violations of supervised and probation -- supervised

2    release outline the basic approach, classification of violations,

3    and in particular the authority for the Court to operate under

4    civil rules as opposed to criminal rules when there is a statute

5    or when there is a criminal penalty of imprisonment.

6          Now, since all of these things are supposed to be

7    aggregated under these own rules, a Grade C violation rates three

8    to nine months.  That's Exhibit 5, I think.

9          THE COURT:  I think this is No. 6.

10         THE DEFENDANT:  Or 6.

11         THE COURT:  Oh, it's 5.  I'm sorry.  It will be

12   admitted.

13         (Exhibit Admitted.)

14         THE DEFENDANT:  Now, Exhibit 6 is Oregon state law

15   enforcement, I'm not required to have a driver's license.  This

16   is a certified copy by the way of Oregon statute.  When our mail

17   starts getting straightened around and I receive it, I will apply

18   for Washington, Oregon, California and Idaho where the states

19   statutes admit that the driver's license is a voluntary act and

20   not required unless someone is engaged in commerce.  That's

21   number one.

22         Number two of this exhibit is the house of

23   representatives, common wealth of Pennsylvania, Harrisburg, where

24   Samuel Roar is a member of the legislative district does the

25   research through Pennsylvania Code, official title 58, can only

1    be properly applied to commercial vehicles and commercial use on

2    the road.   Now, Mr. Crawford didn't do his homework very good,

3    because I have supplied these to him before, and I guess he

4    didn't read them.   That's that exhibit.   That's No. 6.

5            THE COURT:   It will be admitted.

6            THE DEFENDANT:   Exhibit 7 is taken from American

7    Jurisprudence, 16A, the total constitutionality, Section 203.

8    The general rule is that is an unconstitutional statute, whether

9    federal or state.   Since the unconstitutionality dates from the

10   time of its enactment and not merely from the date of decision

11   to, I'm branding it as unconstitutional law, and legal

12   contemplation is inoperative as if it had never been passed and

13   never existed.

14           Now, we have, as evidenced here Booker, Apprendi and the

15   progeny of Apprendi, a local case here, Cunningham, and one here

16   in the supreme court, that when a sentencing judge makes findings

17   as has been shown by the record is a violation of Sixth

18   Amendment.   The supreme court in Booker also stated that certain

19   parts of the mandatory requirements that you make those findings

20   violated the Sixth Amendment under the statute that you're

21   operating at that time.

22           So what we have here, in conclusion, is a very simple

23   matter.   The supervised release cannot be valid.   The sentences

24   originally propounded was founded on a violation of law the

25   circuit amendment.   To concur in a unconstitutional law is t void

1   the general principal of law that imposes no indictments, confers

2   no right.   Conferring no rights would mean that the sentence was

3   invalid.   The supervised release was invalid.   Other liabilities

4   depose no power or authority on anyone and affords no protection.

5           Now, the stuff that was taken out of office in Reno, one

6   of the items that was taken from the central file that I kept all

7   of my correspondence with the probation office was a letter in

8   August to the probation office requesting an administrative

9   hearing for determination of these facts in particular.   Whether

10  the supervised release, the way that it was forced upon me to do

11  that or go back to prison was in fact a valid act of the United

12  States.   And, if it wasn't, how can we come to some sort of

13  agreement.   In other words, I asked for the benefit of

14  discussion.

15          At the time the Booker came out, this Court was sent a

16  letter in 2004 asking for the benefit of discussion.   That's a

17  record, all of those were filed in the central file of the Bureau

18  of Prisons, and they've also been made a part of the central file

19  at the House Judiciary Committee at the request of Mr. Conyers.

20          MR. BLACKSTONE:   Your Honor, if I might interrupt, Mr.

21  Crawford needs to catch a plane.   Can he be excused?

22          THE COURT:   Yes.

23          MR. BLACKSTONE:   Thank you.

24          THE DEFENDANT:   Continuing here, no one is about to

25  obtain constitutional law.   You know courts are bound to enforce

1    it, and it does not allow for the granting of any relief

2    justified, no act of performance under it.  Once a statute is

3    determined to be unconstitutional, no private citizen may take

4    any action pursuant to further provisions.

5         So what we have here is a pretty 'round about way of

6    coming to a real simple fact, the supervised release the way it

7    was set up was invalid.  The sentence is itself was invalid, and

8    it was shown invalid January 12, 2005.  That was the issue I

9    raised in good faith with the probation office, I raised it with

10   the prison system and I raised it with you by letter, and no one

11   has moved on it.

12        Will you enforce the Sixth Amendment today for me and

13   dismiss all of these charges?

14        THE COURT:  No.

15        THE DEFENDANT:  Is there a reason why not?

16        THE COURT:  I'm not here to answer your questions, Mr.

17   Miller.

18        THE DEFENDANT:  Are you aware that the mandamus has been

19   filed and it will be continued tonight as soon as I can get to a

20   pen?

21        THE COURT:  I'm not here to answer your questions, Mr.

22   Miller.

23        THE DEFENDANT:  So that's Exhibit 7, I think.

24        Exhibit 8 is part of the -- I would like to just go

25   ahead and copy the exhibit with the search in evidence summary to

 1   support three of nine points.  And particularly the -- in

 2   particular, the impeachment credibility of the witness Mr.

 3   Crawford for admittedly convicted felonies on the stand, my

 4   goodness.

 5           And Exhibit 8 will be the original filing in the United

 6   States Supreme Court with proof of all of the served parties.

 7   This proof is by the United States Postal Service delivery.

 8   Confirmation receipt within this Court was served or habeas

 9   corpus that was filed with the Supreme Court.  Also the Hague

10   civil court where it's docketed now and other various parties.

11           Raising these same issues, in particularly involuntary

12   servitude issue when a court of the United States will refuse to

13   expose its powers and tell him he can have the benefit of the law

14   that day.

15           THE COURT:  That's Exhibit No. --

16           THE CLERK:  8.

17           THE COURT:  -- 8.

18           THE DEFENDANT:  And the last piece for this, I believe,

19   is the 1995 Guidelines Manual United States Sentencing

20   Commission.  And it should now be made part of the

21   counter-complaint.  And in the mandamus 223, there's a statement

22   by the United States Sentencing Commission that the sentences

23   obtained under their rules prior to that were a violation of the

24   Sixth Amendment.  And I quote from the '97 rules, it says the

25   same thing in the '95 rules:  Supervised release is a new form of

1   post-imprisonment supervised supervision vacated by the

2   Sentencing Reform Act implementation of the guidelines.  The term

3   of supervised release may be imposed by the Court as part of the

4   sentence of imprisonment and at the time of initial sentencing.

5           I was sentenced to 121 months, which is under the

6   statutory construction that I was charged with and convicted of.

7   I've served the time.  The supervised release could have been

8   part of the sentence had it been ordered to be served within the

9   same time; but, as it was structured, it was added on to the

10  sentence authorized by the statute that I was charged with.

11          Continuing on, you have the discretion today under what

12  you're operating under apparently to return me back to the

13  community or sanction me for a civil issue in the so-called

14  breach of trust as set up under Exhibit 9 here, the 1995 and 1997

15  guidelines manual, Chapter 7, Violation of Probation of

16  Supervised Release, part A.

17          THE COURT:  That will be admitted as Exhibit 9.

18          (Exhibit Admitted.)

19          THE DEFENDANT:  How many US marshals are here in the

20  court?

21          THE COURT:  Do you have any others questions or any

22  other information?

23          THE DEFENDANT:  Yes.  I'm going to require mandate order

24  demand that every US marshal here file an affidavit downstairs in

25  the clerk's office and send one to the Congress of the United

1    States, attention Mr. John Conyers, and demand the policy of the

2    violation of my civil rights that you admitted here today on the

3    record and use the disk if you need to get it out right.  That's

4    your job, you're lawyer men.  What you're witnessing here is

5    violation of civil rights, and you all know it.  I'm asking

6    anybody else in the gallery to do the same thing.  I don't know

7    your names, but we all know right from wrong, and what's

8    happening here is wrong.

9              Well, let's see.  We got that one, we got that one down.

10              By the way, the Supreme Court statements and the case

11   law statements issued there are filed as written testimony signed

12   by judge of the United States, each in support of the notion

13   dismiss that was just denied in this private revocation matter.

14   Because, I can't see this as a public matter.  All I can see is

15   that it is a private matter of something I don't understand and I

16   don't think anybody can understand when they're not being told

17   what's going on.

18              You've attempted, Mr. Coughenour, previously, to enforce

19   me to admit I was a United States citizen, which I cannot do.  I

20   cannot be a slave.  And, if that is what's going to happen here

21   now, I guess that's the way it has to be.  And I'll just continue

22   on going to the congress and the international parties to see

23   where we can find someone who is honest.  If you have to give me

24   the benefit of the Sixth Amendment as required by the Supreme

25   Court of the United States, and in front of all these officers

1    and including the US office of justice acting in containment of

2    those orders.

3            I also want to know who is going to indemnify me for

4    these damages.  Judicial notice controls, and you've had judicial

5    notice.  Will a court issue an order of dismissal at this point?

6            THE COURT:  No.

7            THE DEFENDANT:  All right.  Will you order all property

8    taken from my office to be returned?

9            THE COURT:  No.

10           THE DEFENDANT:  I am the real party in interest, the

11   secured party for the res -- the exclusivity holder and there is

12   no evidence to the contrary to these facts.  Anyone having

13   contrary evidence is invited to bring it forth.  But, until then,

14   these facts stand, and that's all I've got to say.

15           THE COURT:  All right.  I find that the government has

16   proven violations 1 through 6.  Give us a disposition date.

17           THE CLERK:  April 6th.

18           THE COURT:  April 6th at 9 a.m.  We'll be in recess.

19           (12:22 p.m., Proceedings in Recess.)

20                          CERTIFICATE

21

22           I, Susan A. Zielie, Official Court Reporter, do
     hereby certify that the foregoing transcript is correct.
23

24
                         /S/ SUSAN A. ZIELIE, RPR, CCR
25                       _____
                         Susan A. Zielie, RPR, CCR